IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SANDRA COVINGTON,

    Plaintiff,

v.

CALIFORNIA DEPARTMENT OF SOCIAL SERVICES,

    Defendant.

No. C 12-04688 WHA

**ORDER RE MOTIONS FOR SUMMARY JUDGMENT, JUDICIAL NOTICE, AND EVIDENTIARY OBJECTIONS**

## INTRODUCTION

In this action under Title VII of the Civil Rights Act and the California Fair Employment and Housing Act, employer moves for summary judgment. Employer also objects to improper authentication of several exhibits appended to employee's exhibits. To the extent stated, summary judgment is **GRANTED**.

## STATEMENT

**1.  COVINGTON'S EMPLOYMENT.**

Beginning in 2005, plaintiff Sandra Covington worked as a licensing program analyst for defendant California Department of Social Services, which operates in Alameda County, among other places. The LPA position involved licensing work and site evaluations of community care facilities for adults and children. Covington declares that from 2005 to 2008, she passed her probationary period, received no negative performance evaluations or discipline, and "was often complimented by management for [her] exemplary performance" (Covington Decl. ¶ 4).

Covington has since brought three claims against the Department, each one made under Title VII and FEHA: (1) race discrimination based on disparate treatment; (2) hostile work environment based on race; and (3) retaliation. The nub of her claims is this: starting in 2008, her managers have subjected her to unfair work scrutiny and criticisms, unjustified denials of salary adjustments and training opportunities, and other disciplinary measures — all on account of her African American race and in retaliation for her complaints of race discrimination (Amd. Compl. ¶¶ 8–19). No racial epithets or racially derogatory comments were ever made, but in Covington's view, the Department treated her non-African American co-workers more leniently. Of note, Covington was never fired and still works for the Department.

### 2. COVINGTON'S WORK PERFORMANCE.

In June 2008, Marie Christie, a Caucasian, was Covington's manager, evaluating Covington's work performance through a written "Individual Development Plan." This plan marked two out of nine performance factors as needing improvement to meet expected standards: "quality of work" and "meeting work commitments." In addition, the plan noted that Covington was expected to turn in her statements of facts on time, and that several of her reports contained incorrect citations for civil penalty assessments (Martin Exh. A at AGO-MSJ-003–4).

In April 2009, Covington received a second individual development plan. Like before, this plan marked two performance factors as needing improvement, while again noting problems with incorrect citations and several other issues (Martin Exh. C at AGO-MSJ-009–13). As a result, a Hispanic manager, Mary Troupe, denied Covington a 2009 "Merit Salary Adjustment," *i.e.*, a five-percent salary increase following twelve months of satisfactory performance. Troupe then gave Covington four more individual development plans — in April 2010, September 2010, April 2011, and April 2012. All of these plans marked two to five performance factors as needing improvement — including "work habits," "taking action independently," and "analyzing situations and materials" — and recorded various work errors committed by Covington. None of the individual development plans, or any of the other work documents submitted on this record, suggest that race was a factor in identifying Covington's work performance as substandard.

2

Collectively, the negative feedback from these plans led to several consequences. One was the denial of subsequent Merit Salary Adjustments for Covington in 2010, 2011, and 2012 (in addition to her 2009 Merit Salary Adjustment denial). Another was the Department's two changes to Covington's "Alternate Work Week" schedule, which otherwise permitted her to work more hours on certain days (still for a total of forty hours per week) in exchange for one day-off every two weeks. Under the first change in July 2009, Covington was no longer allowed to "flex" her day-off; under the second change in June 2011, her AWW schedule was rescinded all together, with the requirement that she work a regular "8 am to 5 pm" schedule every workday. Covington also complains that she was denied training opportunities, including the 2009 and 2010 "Master Analyst Program" training for staff members who were selected "based on their demonstration of leadership qualities, analytical performance, high quality work product and possession of skills which would be enhanced by the MAP training" (Amd. Compl. ¶¶ 8–17; Covington Decl. ¶ 18; Martin Decl. ¶ 10). Furthermore, after telling Troupe that she was "an evil insecure little witch" and that she had "no respect for [Troupe] whatsoever," Covington was demoted to the role of office technician, effective January 1, 2014. At the hearing, counsel for both sides represented that Covington has since been restored to her LPA position, where she remains to date. The goal of this action is to recover the merit raises and other monetary damages.

### 3. COVINGTON'S GRIEVANCES TO HER EVALUATIONS.

Through her union's grievance process, Covington made at least five challenges in connection with her negative performance evaluations. For example, she grieved the April 2009 individual development plan, asking that her evaluation be revised to "meet expectations" for all performance factors and that she be awarded her 2009 merit salary adjustment. The Department, however, denied the grievance based on the documented examples of her work not meeting expectations in her June 2008 and April 2009 individual development plans. Covington appealed to "level two" of the review process, with the Department later finding "no evidence of reprisal" after "[t]he Labor Relations Bureau [had] conducted an investigation" (Martin Exh. C at AGO-MSJ-029–30). She then submitted four more grievances for her subsequent individual

3

development plans, merit salary adjustment denials, and AWW schedule rescission — even appealing some grievances to "level three" of the process and filing several rebuttals of her own. But the Department denied each grievance at each stage, due to the work errors recorded in Covington's individual development plans.

In May 2010, Covington filed a charge of discrimination with the Equal Employment Opportunity Commission and the California Department of Fair Employment Housing.

Moreover, on August 5, 2010, she met with Department representatives to discuss her grievances. As one of the representatives, the Department's Adult and Senior Care Program Administrator wrote to Covington (Martin Exh. D at AGO-MSJ-058):

> After consideration of the issues brought forward, and a review of [Covington's] performance with her management team, it has been determined that the basis for the denial of the MSA is valid, and therefore my decision is to uphold the first and second level denials of the grievance.

Later, on May 4, 2011, Covington filed an internal discrimination complaint with the Department's own Equal Employment Opportunity office, which examined each of her allegations and reported the following (Martin Exh. G at AGO-MSJ-123–32) (emphasis added):

> Well-documented instances of casework, erroneous actions taken and consequences of errors attest to the fact Ms. Covington received negative evaluations as a result of an extensive history of work performance issues, *not as an act of retaliation of discrimination due to race or color*.
>
> \* \* \*
>
> The evidence shows that Ms. Covington's MSA denials were based on unsatisfactory performance, *not discrimination or retaliation*.
>
> \* \* \*
>
> The evidence shows Respondents based their decision not to nominate Complainant for MAP training based on her work performance, *not discrimination or retaliation*.
>
> \* \* \*
>
> Interviews with respondents and witnesses revealed no racial or retaliatory motives were involved in the above employment decisions. *Ms. Covington was unable to produce any evidence that she was held to a higher standard than other LPAs*.
>
> \* \* \*

4

> It is true not all LPAs in the Oakland office received annual evaluations . . . but received them sporadically. *This fact alone is not sufficient evidence to support Ms. Covington's allegation she was issued annual evaluations as an act of harassment and retaliation by Respondents.* Ms. Covington's well-documented PASs and three MSA denials clearly illustrated a need for improvement in her work performance and work product . . . . Annual evaluations therefore, were a consequence of Ms. Covington's established work performance as an LPA.

She commenced the instant action on September 7, 2012, with trial set for May 27, 2014.

Now, the Department seeks summary judgment on all of Covington's claims. It argues that (1) Title VII and FEHA's statutes of limitations bar those claims to the extent that they are based on events from 2008 through May 19, 2009; and (2) in any event, Covington lacks evidence of race discrimination, hostile work environment, or retaliation. This order follows full briefing, supplemental responses, and oral argument.

## ANALYSIS

Ordinarily, Covington's FEHA claims would be dismissed without prejudice because "the Eleventh Amendment bars [a plaintiff's] FEHA claim in federal court" against a state agency. *Freeman v. Oakland Unified Sch. Dist.*, 179 F.3d 846, 846 (9th Cir. 1999). The Department is such an agency, but it has waived sovereign immunity after failing to raise that defense in its present motion. *See Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1022 (9th Cir. 2010).

This order therefore turns to Covington's claims, which "need only [be] assess[ed] under federal law because Title VII and FEHA operate under the same guiding principles." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). While the Department argues that Covington's claims cannot be based on certain events (in 2008 and 2009), it is unnecessary to reach that argument because Covington has not met her burden in opposing summary judgment.

**1.   RACE DISCRIMINATION CLAIM.**

Covington claims race discrimination based on the factors from *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973). Citing those factors, our court of appeals has instructed:

5

> To establish a *prima facie* case under Title VII, a plaintiff must offer proof: (1) that the plaintiff belongs to a class of persons protected by Title VII; (2) that the plaintiff performed his or her job satisfactorily; (3) that the plaintiff suffered an adverse employment action; and (4) that the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff.

*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (emphasis added). Establishing such a *prima facie* case creates the presumption that an employer carried out the challenged action because of the employee's race. The employer, however, can rebut the presumption by producing admissible evidence that it undertook the challenged employment action for a "legitimate, nondiscriminatory reason." Then, the employee must offer direct or circumstantial evidence showing that the employer's proffered reason is pretext for race discrimination, and thus, "unworthy of credence." *Ibid*.

The demotion and denial of merit raises were plainly "adverse employment actions." Covington's non-selection for the MAP training and the denial of her AWW schedule are not so clear in our context, but this order will assume that they must be regarded as "adverse employment actions" for purposes of summary judgment. This order will further assume that the MAP and AWW problems were properly pled, and that Covington has otherwise made out a *prima facie* case.

That said, the employer here has rebutted the presumption by producing admissible evidence that it undertook the challenged adverse employment actions for a legitimate, nondiscriminatory reason. Specifically, the Department points to Covington's below-expectation performance, relying on the various work errors documented throughout Covington's six individual development plans. Without recounting every such error (many have been recorded), this order provides a sampling from those individual development plans (*see* Martin Exhs. C, F, and J) (emphasis added):

> I have listed some examples of your work which did not meet standards. On reports dated 7/9/08 for ABC Day Program[,] civil penalties of $150.00 were issued for repeating a violation. *The violation was for fingerprint violations for which there is not a repeat civil penalty*. You have been provided with civil penalty training materials and have reviewed these with your manager on several occasions. *On an LIC812 for this facility it was stated that the facilities did not have an administrator, yet*

6

> *no citation was issued. When deficiencies are identified on a report there must be a citation issued.*
>
> \*          \*          \*
>
> An example of this is on January 21, 2011, you cited the Bobbie French Residential Care facility for operation without a license because the licensee had accepted two clients into care who you believed were incompatible with the other residents. *Since the facility was already licensed, the citation was not valid. This error required you to make a second visit to the facility to rescind the deficiency.*
>
> \*          \*          \*
>
> AKU Residential Facility Inc. You recently received and reviewed this application. You submitted it for a supervisor review prior to placing it in a pending status. *It was found that the control of property on file was not valid as the submitted lease agreement did not have any signatures for the parties involved. In addition, the identified administrator is not a certified administrator and therefore is ineligible to serve as the facility administrator* . . . . You reported that you had spoken to another LPA about a pending legal action with the current operators which included Mr. Udeh [an administrator at AKU], but you had not seen a copy of the order. *You were aware that there were issues with the facility yet you failed to take sufficient measures to obtain and review the legal orders to ensure that the current applicants were in compliance with the orders during your processing of this application.*
>
> \*          \*          \*
>
> An example of this was on December 22, 2010, you conducted a case management visit to the McClure Care Home during which you cited the facility for failure to have an adequate care plan for two clients with diabetes. The due date for the correction of the violation was December 29, 2010. *The licensee failed to submit adequate documentation to clear the deficiency to the department by the due date. On January 21, 2011, you made a visit to the facility to conduct a complaint visit, but failed to address the outstanding citation for the care plans with the licensee during this visit. The violation was not cleared until March 1, 2011.* Your failure to address all the issues demonstrates your inability to make the most effective use of your time and resources as well as failing to ensure that the clients in this facility were receiving adequate care to meet their needs.
>
> \*          \*          \*
>
> On June 27, 2011[,] you conducted a POC visit to the Brown Group Home to follow up on type B deficiencies you had cited during an annual visit on August 11, 2010. *The timeframe for following up on deficiencies is 10 days after the due date. When questioned about why it took you over 10 months to follow up on*

7

> *the outstanding deficiencies, you stated that you work with your administrators and you were giving them a chance to correct the deficiencies. You failed to consult with your supervisor prior to completing this visit to determine if the outstanding issues were priority work in line with the department's goals.*

This sampling is not exhaustive. The individual development plans reported a number of other problems with Covington writing incorrect citations, submitting untimely statements of facts, signing up for Department vehicles, maintaining her control book, and providing incomplete reports. It is because of the documented work errors that the Department's EEO office rejected Covington's discrimination complaint (Martin Exh. G at AGO-MSJ-123–32). In fact, Covington herself admitted to some of these errors in her rebuttals, which she submitted to the Department (*see* Martin Exhs. C, D, and F) (emphasis added):

> Overall, my follow-up visits are always conducted in a timely manner. *However, improvement is needed in the areas of writing* [statements of facts]*, producing these documents in a timely manner, documenting telephone contacts, typing clear and concise POC's and supportive detail statements.*
>
> \*   \*   \*
>
> Regarding Bright Star Residential name change application, we all make mistakes and being that this was a new task for us. *I did overlook the licensee and corporation's name. Yes, I concur that I received application review training; however, I do miss some details or other relevant information in reviewing these applications from time to time.*
>
> \*   \*   \*
>
> Regarding the January 21, 2011 citation at Bobbi French Residential Care facility, *I admit it was an error on my behalf to cite the facility for running unlicensed.* I conducted four inspections this day and a lot was going on at this particular facility. However, you and I discussed this upon my return into the office as I didn't imagine this would be indicated in my evaluation.
>
> \*   \*   \*
>
> As for the [AKU Residential Facility Inc.] application, during the application review process, I returned the application to the applicant referencing the need to appoint an Administrator because she was not qualified along with other issues with the application. After learning from LPA Rick Gasparini that legal action was taken against parties who formerly operated the facility, I gave him a list of individuals who were listed on the LIC 500 asking to confirm that no action was taken against them. After receiving confirmation that the individuals were cleared,

8

> there was no need to address other concerns. However, when the applicant listed "Hyacinth Udeh" as the administrator, I wasn't aware that legal action was taken against her. *As I reflect back, perhaps I should had obtained a copy of the stipulation in order from Rick once I learned that administrative action was taken against individuals at the facility.*

The Department has also demonstrated that its decisions to adjust Covington's AWW schedule and to decline her MAP training requests were based on a legitimate, nondiscrimination reason, which, for the sake of convenience, will be addressed below (*see* Martin Decl. ¶ 11 at 10:16–20; Exh. F at AGO-MSJ-094).

To this, Covington counters that there is evidence of pretext, raising three examples in her opposition (Opp. 15–16). *First*, Covington points to the Department's changes to her AWW schedule, such that she was no longer allowed to "flex" or change her day-off, and later was removed from the AWW schedule all together. *Second*, she highlights the denials of her requested MAP training in 2009 and 2010. *Third*, she contends that she "was unjustly issued negative performance evaluations and denied her [merit salary adjustments] for alleged performance issues that did not occur as alleged, were outside her control, caused by other employees, or for which non-African American LPAs who engaged in the same behavior were not disciplined" (*id.* at 16). Covington, in essence, suggests that the Department treated her non-African American co-workers more leniently, despite purported mistakes with their own work.

But the record as submitted does not support Covington's arguments for pretext. In regards to the Department's changes to her AWW schedule, Covington declares (Covington Decl. ¶¶ 10, 15) (emphasis added):

> On or about July 2009, I was informed by Ms. Troupe that I could no longer "flex" (i.e. change) my Alternate Work Week ("AWW") work schedule, meaning that I could no longer change my regularly scheduled day off every two weeks to a different day during the week . . . . Since I had been able to change my normal day off for years while under the supervision of other LPMs, I inquired with RM Martin as to why I was no longer allowed to change my normal day off. In response, RM Martin told me that I could no longer change my normal day off because Sacramento needed to know exactly when an LPA was off. *However, Ms. Martin's response appears to be untruthful because I observed that other non-African American LPAs (Moira Aguilar and Richard Gasparini) were still allowed to change their normal day off under the AWW program, and Sacramento received correspondence that was signed off by the*

9

> *LPM, RM and Program Administrator that clearly states which LPAs are on the AWW program and which days the LPAs were going to be off.*
>
> \*       \*       \*
>
> Additionally, on or about April 29, 2011, LPM Troupe issued me a memorandum stating that my AWW schedule was rescinded effective June 1, 2011. Said memorandum indicated that my AWW schedule was rescinded "to better meet the needs of this office and [my] caseload" and to ensure that I "work a schedule that allows for the availability of a supervisor whenever [I am] working whether it be in the field or the office." *This reasoning is meritless since LPM Troupe was equally available to me whether I worked an AWW schedule or a regular 8:00 AM to 5:00 PM schedule.* In fact, several complaints I submitted to LPM Troupe were not reviewed for four (4) or five (5) weeks until after I submitted them, and many times when I asked for an update on the status of the complaints, LPM Troupe said she was too busy.

This declaration falls short. In light of the documented history of Covington's substandard work performance, it is easy to see why the supervisors would prefer that she work a normal forty-hour week rather than impose upon herself extra long workdays so that she could take a day-off. Longer work hours run the risk of even more mistakes. As for her supposed comparators, she has not shown that Gasparini and Aguilar had work deficiencies as bad as her own. Her opinion on this score is inadmissible.

Another reason given by the employer is that Covington abused the AWW schedule. To that end, a second-line supervisor at the Department declares that Covington "repeatedly abused this privilege" of her flexible work week schedule (Martin Decl. ¶ 11 at 10:16–20; Exh. C at AGO-MSJ-011–15). Her AWW schedule was therefore narrowed — such that she could not "flex" or change her days-off — and later revoked all together — due to poor work performance. Indeed, the record reflects Covington's problems with her work schedule back in April 2009 (Martin Exh. C at AGO-MSJ-011–15) (emphasis added):

> You have been provided with the LPA expectations memo, and stated you were clear. On desk duty days your hours would be from 8am to 5pm with one hour lunch. When varying from this, your supervisor should be notified . . . . You also reported to work after 9:00 AM on your desk duty day as you stated you had forgotten. When on an AWW schedule, you must work the schedule that has been preapproved by your manager, which would be 9 hours a day.

*     *     *

> It has come to our attention that your AWW schedule is in error. When on an AWW schedule (9/80), you are expected to work 9 hours a day. In a two week period, you would get one day off, one 8-hour day, and the remaining days are 9-hour days, for a total of 80 hours. *Your current schedule shows a start time of 9:00 AM and an end time of 6:00 PM, with a 30 minute meal period. This is only 8.5 hours. Your itinerary often shows that you take an hour lunch, in this case, you are only working 8 hours. Your schedule must be modified to reflect 9 hour days. If this is not possible, you can work a regular schedule . . . .*

There is also no direct evidence of pretext, either here or elsewhere in the record. Nor does Covington's declaration provide sufficient circumstantial evidence to show pretext. On this point, our court of appeals requires circumstantial evidence of pretext to be "'specific' and 'substantial' to create a genuine issue of material fact." *Cornwell*, 439 F.3d at 1029 (internal citations omitted). That Covington disagreed with the "meritless" reasoning to later rescind her AWW schedule is also unpersuasive, as her "subjective belief that the challenged employment action was unnecessary or unwarranted" does not create a genuine issue of material fact. *Id.* at 1029 n.6.

Covington also claims racial pretext for not sending her to the MAP training, and more generally, for not disciplining other non-African American LPAs who "engaged in the same behavior . . ." (Opp. 16). As to the denied training, Covington declares (Covington Decl. ¶ 18) (emphasis added):

> In or around 2010, I was informed that the MAP training was for LPAs who perform at a journey level and that I did not possess the requisite skills to be nominated to attend the MAP training. *That statement is untrue. Richard Gasparini was nominated to attend the MAP training in 2010. I observed Mr. Gasparini's substandard performance around that time when I was assigned a complaint regarding a facility at which he granted a license application that contained several errors. I also observed that he had several outstanding complaints during that time that were not investigated in a timely manner.* I had a heavier caseload than Mr. Gasparini, in addition to the extra field visits management requested that I perform, and I was also training new LPAs around that time.

This too is unpersuasive. Covington was not the supervisor of Gasparini, and was not in a position to opine on whether his performance was as bad as her own. Even assuming that Gasparini made "several errors" on one licensing application and had "several outstanding

11

complaints" in 2010, as Covington declares, this pales in comparison to the numerous work mistakes documented in Covington's six individual development plans and other work documents. In other words, no reasonable jury could find from this record that Gasparini's work errors were comparable in scope to Covington's work mistakes, such that there is somehow "specific" and "substantial" evidence of pretext. *Cornwell*, 439 F.3d at 1029 (internal citations omitted).

Covington cited one of her exhibits during the hearing to show a list of eight untimely complaints by Gasparini (Covington Exh. 5 at SC-MSJ-101). But the earliest date on which these allegedly untimely complaints could have existed was 2011, *after Gasparini had already been nominated for the MAP training in 2010*. This means that at most, Covington's exhibit — on which she relies to show pretext in 2010 — only provides after-the-fact evidence of work mistakes made by Gasparini a year later.

At the hearing, the employer pointed out that all of the Gasparini records used by Covington to show that Gasparini had a lot of overdue complaints as well were after-the-fact, meaning not yet in existence and for a time period well after the decision to let him attend the MAP training in 2010. Covington's attorney replied that there were similar records for the pertinent, earlier time period. The undersigned judge then gave her an opportunity to submit those records. Covington's attorney did not submit any further records, however.

Covington next turns to her declaration and exhibits to demonstrate work errors purportedly committed by other non-African American colleagues. Her argument is that despite such mistakes, including missed deadlines, non-African American employees received no disciplinary action. But even when considered in the light most favorable to Covington, her declaration does not show that non-African American co-workers committed a similar scope of mistakes. For instance, Covington declares that two co-workers each missed a complaint, one by a day, and the other by nine days (Covington Decl. ¶ 17). But this is not comparable to when Covington alone took ten months to follow-up on the Brown Group Home's cited deficiencies, when the deadline to do so was only ten days (Martin Exh. J at AGO-MSJ-174). In addition, her argument that non-African American co-workers made similar work mistakes rests on unclear

and voluminous exhibits (*see, e.g.*, Covington Decl ¶ 11; Exhs. 1–6). While Covington declares that these exhibits contain true and correct copies of her co-workers' facility evaluation reports, control-book pages, and other documents, as well as Covington's e-mails to management about delayed processing of her complaints, they are not self-explanatory in showing what work errors (if any) were supposedly committed by her colleagues.[*] This is not the "specific" and "substantial" evidence required to show pretext. *Cornwell*, 439 F.3d at 1029 (internal citations omitted).

Nor has Covington provided evidence of negative performance evaluations for Gasparini or other alleged comparators. At the hearing, Covington's attorney explained that she did not obtain performance evaluations for non-African American co-workers, after the Department objected to the disclosure of such records out of privacy concerns. Covington's attorney then admitted that she ultimately did not bring a motion to compel the disclosure of those evaluations. The undersigned judge would have considered such a motion and probably allowed disclosure of some of those evaluations, so that a side-by-side comparison between Covington and her non-African American colleagues was possible. But Covington's counsel made the decision not to bring that motion. The burden now rests on her to show "specific" and "substantial" evidence of pretext. The absence of such performance evaluations thus counts against her case.

Accordingly, this order finds no triable issue of fact with race discrimination, as Covington has not met her burden in demonstrating pretext.

### 2. HOSTILE WORK ENVIRONMENT CLAIM.

For Covington's claim of hostile work environment based on race, both sides rely on *Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir. 1998) (internal citations omitted):

> To prevail on a hostile workplace claim premised on [] race . . . a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial . . . nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment . . . . The more

---

[*] The Department asserts that Covington obtained these documents via unauthorized access to the Department's database and by "surreptitiously copying pages from her colleagues' control books." According to the Department, Covington did so for personal gain, "which is explicitly forbidden by [the Department] and State policy, and by state law" (Reply 6).

13

> outrageous the conduct, the less frequent must it occur to make a workplace hostile.

This order rests on the third element alone, specifically on insufficient evidence to sustain the third element. At most, Covington argues that the Department "communicated a hostile message" based on her race by delivering "unjustified, inaccurate" work criticisms in her individual development plans, denying her merit salary adjustments and training opportunities, conducting more performance evaluations of her work, applying stricter standards and penalties, and rescinding her AWW schedule — all of this in the view that other non-African American LPAs received fewer performance evaluations, more training opportunities, and lesser workloads under more lenient standards (Opp. 17).

But this is where the story ends. Even considering Covington's declaration and exhibits, as well as events since 2008, this order finds insufficient evidence to show that the Department's conduct was sufficiently severe or pervasive to create a hostile work environment. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003), explained (internal citations omitted):

> To determine whether conduct was sufficiently severe or pervasive to violate Title VII, we look at "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." In addition, "[t]he working environment must both subjectively and objectively be perceived as abusive."

Our court of appeals then affirmed summary judgment for the employer there, where a supervisor's conduct was "not severe or pervasive enough to violate Title VII" after making two racially offensive remarks, yelling at the plaintiff on two occasions, and making false complaints about the plaintiff over the course of more than one year. *Id.* at 643. *Vasquez* also discussed *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1037 (9th Cir. 1990), in which "no reasonable jury could have found a hostile work environment despite allegations that an employer had posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino." *Vasquez*, 439 F.3d at 643.

Much less is found here. Covington admitted in her deposition that she never heard of a racially derogatory comment from Christie or Troupe (McMahon Exh. A at 133:1–134:25). Furthermore, although Covington argues that she suffered "unjustified, inaccurate remarks on her performance evaluations," as well as merit salary adjustment denials, the record shows that Covington generally disagreed with, tried to explain away, or even admitted to her documented work errors (Opp. 17). With one error, Covington took over ten months, rather than the required ten days, to follow-up on a deficiency cited with the Brown Group Home. In her rebuttal, however, she gave no response to explain even this error (Martin Exh. J. at AGO-MSJ-174–83).

Covington's other claims of severe or pervasive conduct are also unconvincing. In her opposition, she alleges (Opp. 17):

> [The Department] . . . mandated that Plaintiff receive [] bi-annual performance evaluations for several years when other similarly situated non-African American employees were not subjected to the same requirement . . . continuously held Plaintiff to a stricter standard regarding her work performance than the standard to which non-African American LPAs were held . . . continuously penalized Plaintiff for issues for which non-African American LPAs who engaged in the same behavior were not penalized . . . assigned Plaintiff a heavier caseload than non-African American LPAs . . . denied Plaintiff the opportunity to attend trainings based on her allegedly substandard performance while allowing a Caucasian with several performance issues to attend . . . and unjustly altered and rescinded Plaintiff's AWW schedule.

Covington, however, received six performance evaluations over the span of three years. Moreover, the alleged "stricter standard" only appears in Covington's declaration, in which she describes how she (but not a Caucasian co-worker) was barred from using more than fifteen minutes to return phone calls or type a certain kind of supportive document while in the field (Covington Decl. ¶ 13). Her declaration also provides the following generalizations, often without specific facts: she was "penalized . . . for issues for which other LPAs were not penalized," she "had a heavier caseload" than "a Caucasian" who was nominated for a training opportunity (even though he purportedly committed work errors), and she could no longer "flex" her AWW schedule, which was ultimately rescinded (*id.* ¶¶ 9–18; Opp. 17). Again, it is not apparent from Covington's declaration or exhibits what work errors her colleagues reportedly committed, or how often the above conduct occurred.

15

1  This order therefore finds that Covington has not shown sufficiently severe or pervasive

2  conduct by the Department to establish a hostile work environment claim.

3  **3. RETALIATION CLAIM.**

4  Finally, an employee establishes a *prima facie* claim of retaliation by showing that:

> (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action.

*Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). If such a *prima facie* claim is made, the employer must articulate a legitimate, non-retaliatory reason for its actions, and at that point, the employee bears "the ultimate burden" of demonstrating that the stated reason is pretext for retaliation. *Ibid*. This can be done by either "directly persuading the court that a discriminatory reason more likely motivated the employer[,] or indirectly [] showing that the employer's proffered explanation is unworthy of credence." *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003).

Here, the decisive blow is that even if Covington can present a *prima facie* claim of retaliation, the Department, as before, has asserted a legitimate, non-retaliatory reason for its actions — namely, that Covington's work performance was deficient. Indeed, the record manifests a sustained pattern of work errors in her six individual development plans and other work documents.

Covington must therefore proffer "'specific' and 'substantial' evidence of pretext to overcome [the Department's] summary judgment motion." *Stegall*, 350 F.3d at 1066. But her opposition only asserts the following (Opp. 18):

> Plaintiff has presented sufficient evidence from which a jury may infer that [the Department] subjected Plaintiff to adverse actions based on her opposition to discrimination and her filing an EEOC Charge of Discrimination. For example, many of the adverse actions [the Department] issued to Plaintiff occurred shortly after, and in some instances only days after, Plaintiff opposed discrimination or filed a discrimination charge. Furthermore, Plaintiff is informed and believes [that a Caucasian co-worker] Moira Aguilar has not filed discrimination charges against [the Department] and was often treated more favorably than Plaintiff under the circumstances.

16

Lacking cites to facts, declarations, or other evidence for support, these are conclusory assertions that fall short of the "specific" and "substantial" evidence needed to show pretext.

Nor does Covington's own declaration help. At best, her declaration states that "shortly after" she filed a charge of discrimination with the EEOC, Christie and Troupe began to unilaterally change the terms and conditions of her employment and express a negative attitude towards her (Covington Decl. ¶ 12). Without details about "shortly after," this presents neither "specific" nor "substantial" evidence connecting the alleged changes to Covington's work to her charge of discrimination. In fact, the Department's EEO office found that "Ms. Covington's work performance issues were identified *prior to the EEOC filing*, and all PAS and MSA denials were completed prior to the latter two filings" (Martin Exh. G at AGO-MSJ-132) (emphasis added).

As a result, this order finds no "specific" and "substantial" evidence of pretext to save Covington's retaliation claim. Summary judgment on all three claims is thus **GRANTED**.

### 4. JUDICIAL NOTICE AND EVIDENTIARY OBJECTIONS.

The Department moves for judicial notice of the charge of discrimination that Covington filed with the DFEH and EEOC. Insofar as this order considers that charge, it does so based on declarations and other exhibits, not on the actual content of the charge itself. The motion for judicial notice is therefore **DENIED AS MOOT**.

In addition, both Covington and the Department object to each other's declarations and/or exhibits. Covington, for instance, challenges eleven parts of a declaration submitted by Ellen Martin, a former regional manager for the Department (Opp. 19–20). The Department objects to improper authentication of the exhibits appended to Covington's declaration. This order, however, need not reach those contested parts of the summary-judgment record, because it relies instead on undisputed portions of declarations or exhibits (*compare* Martin Decl. ¶ 11 at 10:16–20 *with id.* at 10:24–26). All evidentiary objections are accordingly **DENIED AS MOOT**.

**CONCLUSION**

To the extent stated, the Department's motion for summary judgment is **GRANTED**. Moreover, the Department's request for judicial notice, as well as both sides' evidentiary objections, are **DENIED AS MOOT**. Judgment shall be entered herewith.

**IT IS SO ORDERED.**

Dated: May 12, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE